IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MYLES HUGHES, | ) |
| *Plaintiff* | ) ) ) ) |
| v. | ) No. 20 CV 4049 ) |
| TOM DART, et al., | ) Judge Virginia M. Kendall ) ) |
| *Defendants*. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Myles Hughes brings this civil rights action against Defendants County of Cook, Sheriff Tom Dart, Recruit Raphael Wordlaw, Correctional Sergeant Marcin Rejniak, and Correctional Sergeant J. Garcia, (collectively the "Defendants"). The Third Amended Complaint alleges various claims in connection with Defendants' failure to properly respond to a crisis in which Hughes self-inflicted potentially grave harm. Specifically, Hughes brings claims for: Deliberate Indifference to Serious Medical Needs (Counts I and III); Supervisory Liability (Count II); violation of the Americans with Disabilities Act ("ADA") (Count IV); violation of the Rehabilitation Act (Count V); and Indemnification (Count VI). Before the Court is Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 47). For the following reasons, the Court grants in part and denies in part Defendants' motion [47].

**BACKGROUND**

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir.

1

2014). The following factual allegations are taken from Hughes's Third Amended Complaint, (Dkt. 20), and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Plaintiff Myles Hughes is a detainee at the Cook County Jail (the "Jail"), where he has resided since October 2014. (Dkt. 46 ¶¶ 13–14). Hughes was 19 years old and weighed approximately 100 pounds at the time of his arrest. (*Id.* ¶ 15). He has suffered from mental health illnesses including depression, anxiety, and post-traumatic stress disorder. (*Id.* ¶ 26). In addition, Hughes has "obsessive tendencies" which include fascination with blood and bodily fluids. (*Id.*). At times, Hughes drinks his own blood – and to the extent his is able, the blood of other detainees. (*Id.*). These mental health conditions have led Hughes to engage in "self-mutilation, self-harm, and attempted suicide." (*Id.* ¶ 27; *see also id.* ¶ 38 (noting that Hughes has attempted suicide on more than one occasion)). Hughes maintains that each of the Defendants knew about his mental health history and his propensity for self-harm. (*Id.* ¶ 28).

"At some point" between his arrival at the Jail in October 2014 and July 5, 2020, Hughes was assigned to the Division 9 inmate housing complex. (*Id.* ¶¶ 17–18). There, he was "subjected to physical, sexual, and emotional abuse by one of his cellmates." (*Id.* ¶ 19). Hughes reported this abuse to a guard and requested transfer to a new cell – to which the unnamed guard suggested that Hughes should "submit a grievance or hang [himself]." (*Id.* ¶ 20). Hughes was eventually moved to the Division 10 housing unit, which is a "medical and acute psych" building. (*Id.* ¶¶ 21–22). The guards there knew that Hughes's previous cellmate physically and sexually abused him. (*Id.* ¶ 23). Hughes again suffered physical, sexual, and emotional abuse by one of his Division 10 cellmates. (*Id.* ¶ 24). As a result of these instances of abuse, Hughes attempted self-harm, self-mutilation, and suicide on "multiple occasions." (*Id.* ¶ 25). Because of his severe mental illness,

2

Hughes was assigned to the Jail's Residential Treatment Unit ("RTU"). (*Id.* ¶ 29). The RTU provides mental health treatment and substance abuse counseling for detainees. (*Id.* ¶ 30). The RTU also has 24-hour crisis and intervention services for those in need. (*Id.*).

On or around June 24, 2020, Hughes filed a grievance concerning the abuse involving his cellmates detailed above. (*Id.* ¶ 31). The grievance was subsequently denied by the Cook County Sheriff's Office. (*Id.*). On or about July 5 or July 6, 2020, Hughes attempted suicide by cutting his arm with a metal object. (*Id.* ¶¶ 32–33). This resulted in deep lacerations to his forearm and upper arm and a substantial loss of blood. (*Id.* ¶¶ 33–34). Hughes recalls that his blood "pool[ed] . . . on the floor and beneath the door to the cell," (*id.* ¶ 31), and that he was screaming while cutting himself, (*id.* ¶ 39). Hughes's blood was observed by at least one other detainee. (*Id.* ¶ 39). Moreover, Recruit Wordlaw witnessed this suicide attempt: he heard Hughes's screams, observed Hughes cutting himself, and saw Hughes bleeding. (*Id.* ¶¶ 40–41). Despite being aware that Hughes was attempting suicide "for at least fifteen to thirty minutes," Wordlaw did not attempt to stop Hughes from harming himself. (*Id.* ¶¶ 42–43). Wordlaw also did not timely invoke medical emergency protocols. (*Id.* ¶ 45). Wordlaw eventually reported that Hughes was "threatening self-harm." (*Id.*). Sergeant Rejniak responded to Hughes's cellblock, but did not go to Hughes's cell to check on him. (*Id.* ¶ 46). Rejniak reported to medical staff that that Hughes had a "small cut on his arm." (*Id.* ¶ 47). Sergeant Garcia subsequently transported Hughes to the medical dispensary for first aid treatment. (*Id.* ¶¶ 52–53). Thereafter, Hughes fainted, prompting Jail authorities to contact 911 for emergency medical care. (*Id.* ¶¶ 53–55).

## LEGAL STANDARD

When considering a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all factual allegations in the amended complaint and draw all permissible inferences in [the

3

plaintiff]'s favor." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015). To state a claim upon which relief may be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Detailed factual allegations are not required, but the plaintiff must allege facts that when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678. In analyzing whether a complaint meets this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Id.* at 679. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

## DISCUSSION

Defendants move to dismiss Hughes's Third Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See generally* Dkt. 47). For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.

**I. Deliberate Indifference to Serious Medical Needs (Counts I–III)**

The inquiry for assessing a due process challenge to a pretrial detainee's medical care involves two steps. First, the court asks whether the defendants "acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences" of the treatment provided to the prisoner. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018). A showing of negligence, or even gross negligence, is insufficient to establish a violation of the detainee's constitutional rights. *McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018). The second step is to determine whether the challenged conduct was objectively reasonable. *Miranda*, 900

4

F.3d at 354. "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886 (citing *Miranda*, 900 F.3d at 354).

Further, to establish liability for deliberate indifference, a plaintiff must allege the defendants' "personal involvement in the alleged constitutional deprivation." *Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012) (citing *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010)). *See also Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008); *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). However, "while it is true that a plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right, a defendant's direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). The personal responsibility requirement may be satisfied where an official "acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1006 (7th Cir. 1982) (emphasis added). *See also Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015).

a. **Individual Liability (Counts I & III)**

Hughes asserts claims against Defendants Wordlaw, Garcia, and Rejniak for deliberate indifference to his medical needs. (*See* Dkt. 46 at 8 (Count I), 9 (Count III)). Defendants move to dismiss Hughes's Section 1983 claims on the basis that Hughes pleaded no specific conduct to plausibly allege that the Defendants were personally responsible for a constitutional violation.

(Dkt. 47 at 4 ("[Hughes] has not provided facts to establish how the Defendants were deliberately indifferent to [his] medical needs.")). Per Defendants, the Third Amended Complaint shows that they "ensured [Hughes] received medical assistance" when they discovered his emergency. (*Id.* at 4–5). They also argue that argue that "[t]here is no allegation in the [Third Amended Complaint] that Wordlaw witnessed the Plaintiff attempt self-harm, which merely speculates that he was aware of it and provides no additional information[.]" (Dkt. 50 at 2).

      Viewing the allegations in the light most favorable to Hughes – as the Court must on this Motion to Dismiss – Hughes adequately alleged that Recruit Wordlaw was deliberately indifferent to his medical needs. The Third Amended Complaint alleges that Wordlaw "saw Myles cutting himself" with a metal object and "heard [Hughes] screaming." (Dkt. 46 ¶¶ 33, 37, 40). Hughes reports that his self-inflicted cuts resulted in "deep lacerations to his forearm and upper arm." (*Id.* ¶ 33). These facts raise the plausible inference that Hughes observed the deep wounds on Hughes's body. Hughes further alleged that his cutting resulting in "a substantial loss of blood" which "pool[ed]" on the floor and even "beneath the door to the cell" – and that Wordlaw "saw [Hughes] bleeding." (*Id.* ¶¶ 34, 35). Building on these allegations, Hughes also maintains that Wordlaw "was aware that [Hughes] was attempting suicide for at least fifteen to thirty-minutes." (*Id.* ¶ 42). Yet despite witnessing Hughes's attempt to take his own life, Wordlaw apparently "did not attempt to stop" Hughes from harming himself, nor did he timely invoke the Jail's medical emergency protocols. (*Id.* ¶¶ 43, 45). Then, when Wordlaw finally set the emergency protocols in motion, he reported that Hughes was merely "*threatening* self-harm" – a gross understatement of the incident. (*Id.* ¶ 45 (emphasis added)). Hughes claims that he "blacked out" as a result of these events and continues to experience "emotional distress," among other things. Viewed together and taken as true, these facts support the claim that Wordlaw "deliberately refused to address

6

[Hughes's] medical needs by . . . dismissing the threat of self-harm, self-mutilation, and suicide and minimizing the extent of injuries sustained by Myles in the incident occurring on or around July 5th and 6th, 2020." (*Id.* ¶¶ 57, 66).

Defendants argue against this result by highlighting Hughes's concession that Wordlaw "did in fact respond to Plaintiff's distress by calling for help and summoning his supervisor, Rejniak, to the tier, which is certainly objectively reasonable under the circumstances." (Dkt. 50 at 2). Moreover, they assert that Hughes "provides no facts indicating that Wordlaw knew or had reason to know that Plaintiff was going to harm himself, that Plaintiff had smuggled contraband into his cell before using it to commit self-harm, or that Wordlaw should have taken any specific action prevent Plaintiff's self-harm." (*Id.* at 3). These arguments miss the mark. Hughes does not dispute that Wordlaw eventually intervened in his emergency, and the issue here is not whether Wordlaw could have predicted that Hughes might harm himself. Instead, he claims that Wordlaw watched on as Hughes attempted suicide and deliberately failed to intervene or jumpstart emergency medical protocols – even as Wordlaw heard Hughes scream in agony and witness Hughes's blood pool on the floor, seeping out of his cell. The dispute here also concerns Wordlaw's decision to "minimize[] the extent of [Hughes's] injuries" to medical authorities, which potentially magnified Hughes's risk of serious harm. (*E.g.*, Dkt. 46 ¶ 57).

In further support of their argument as to Wordlaw, Defendants cite *Shields v. Dart*, 664 F.3d 178 (7th Cir. 2011). There, the Court found that an officer was *not* deliberately indifferent when she failed to intervene when an inmate was being attacked. *Id.* at 181. This was because "she took other steps to intervene by promptly calling for back-up and monitoring the fight from [a] secure area," and because a prison guard, acting alone, is not required to take "unreasonable risk[s]" that would put him "in significant jeopardy." *Id.* (citing *Guzman v. Sheahan*, 495 F.3d

7

852, 858 (7th Cir. 2007)). *Shields* is inapposite here, however, because it was decided on a motion for summary judgment. *Id.* at 180. The questions of whether Wordlaw was justified in refraining from intervening on Hughes's behalf, or whether Hughes can present evidence that Wordlaw's delay exacerbated his injuries, are both matters for another day. At this point in the litigation – where Hughes is entitled to every reasonable inference arising from allegations in his complaint – the facts suffice to state a claim of deliberate indifference as to Defendant Wordlaw. Accordingly, the Court denies Defendants' motion to dismiss him from this action. (Dkt. 47).

Conversely, Hughes fails to state a claim against the remaining individual defendants. To begin, Hughes alleges that Sergeant Rejniak was familiar with Hughes's mental health conditions and history of self-harm, self-mutilation, and attempted suicide. (Dkt. 46 ¶ 48; *see also* Dkt. 49 at 8 ("And Rejniak knew that Hughes was on the RTU because of his severe mental health illnesses, incidents of self-harm, and multiple suicide attempts.")). Rejniak allegedly responded to Hughes's cellblock during the incident that took place on July 5th or July 6th but did not go to Hughes's cell to check on him. (Dkt. 46 ¶ 46). Rejniak also "contacted a medical staff member to report that [Hughes] had a small cut on his arm," (*Id.* ¶ 47), which Hughes argues "constitutes a deliberate misrepresentation and a corresponding disregard for Hughes' serious medical needs," (Dkt. 49 at 8). Even taking these allegations as true, they fail to plead a constitutional harm. Although Rejniak purportedly understated the extent of Hughes's injuries – which, again, Rejniak did not personally observe, (Dkt. 46 ¶ 46) – the facts as alleged show that he called for medical assistance upon arriving to the cellblock. Hughes provides no further allegations exploring how Rejniak failed to "take sufficient action to intervene in [Hughes's] attempt at self-harm." (*Id.* ¶ 50). Because Hughes failed to plead facts showing that Rejniak's behavior was objectively unreasonable and

8

amounted to a constitutional deprivation, *McCann*, 909 F.3d at 886, Defendants' motion to dismiss Rejniak from Counts I and III is granted with prejudice. (Dkt. 47).

Similarly, the Third Amended Complaint is devoid of any facts indicating that Sergeant Garcia played any individual role in a constitutional deprivation. Hughes merely alleges that Garcia was aware of Hughes's mental health conditions and eventually transported him to the medical dispensary. (Dkt. 46 ¶¶ 48, 52). Nothing in the Third Amended Complaint suggests that Garcia was indifferent to Plaintiff's medical needs or took part in Hughes's alleged injury whatsoever. Hughes's failure to plead any such facts is fatal to his claim. Therefore, Garcia must be dismissed from Counts I and III with prejudice. (Dkt. 47).

### b. Supervisory Liability (Count II)

Hughes sets forth a theory of supervisory liability as to Defendants Garcia and Rejniak for the harms flowing his suicide attempt on July 5th and 6th, 2020. (Dkt. 46 at 8 (*see* Count II generally)). Specifically, Hughes alleges that "Defendants Garcia and Rejniak knew or should have known [that he] would commit serious self-harm, self-mutilation, or attempted suicide on July 5th and July 6th, 2020. Despite this knowledge, Defendants Garcia and Rejniak failed to take appropriate measures to correct the constitutional violations enumerated herein." (*Id.* ¶¶ 61–62).

"Under § 1983, there is no *respondeat superior* liability." *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002); *see also Courtney v. Devore*, 595 Fed. App'x 618, 620 (7th Cir. 2014) (citing *Perkins*, 312 F.3d at 875) (stating same and affirming dismissal of Section 1983 claim where defendant was not personally involved in the alleged misconduct). Instead, to be liable under § 1983, "the individual defendant must have 'caused or participated in a constitutional deprivation.' " *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994)). In order for supervisors to be liable in

9

their individual capacity for a 1983 claim, "they must be personally responsible for the deprivation of the constitutional right." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quotation omitted). For a complaint to properly plead that a supervisor was personally responsible, "the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.' " *Id.* (quoting *Jones v. City of Chi.*, 856 F.2d 985, 992–93 (7th Cir. 1988)).

The Complaint contains no allegations demonstrating that Defendants Garcia or Rejniak "knew or should have known" that Hughes needed mental health care on July 5th and 6th prior to the self-harm incident at issue here. Also absent from the Complaint are allegations that Garcia or Rejniak facilitated, condoned, or turned a blind eye to any purported constitutional deprivations Hughes suffered on those dates. Instead, the facts as pled indicate that these Rejniak called the medical dispensary upon learning of Hughes's self-harm and Garcia transported Hughes there to receive medical attention. (Dkt. 46 ¶¶ 47, 52). The Court therefore grants Defendants' motion to dismiss Count II with prejudice. (Dkt. 47).

### c. *Monell* Liability (Count III)

Defendants next argue that the Complaint fails to state a claim against Dart in his official capacity upon which relief can be granted because it does not allege that a policy of the Jail caused the alleged constitutional deprivations. (Dkt. 47 at 9). "In order to prevail on an official capacity suit against the sheriff, the plaintiffs must show that an official policy or custom caused the injury." *Perkins*, 312 F.3d at 875. "A plaintiff may demonstrate an official policy through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the

10

constitutional injury was caused by a person with final policymaking authority." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007).

Even viewing the allegations in the Complaint in the light most favorable to Hughes, it cannot be reasonably inferred that Dart violated Hughes's constitutional rights as a person with final policymaking authority; nor it is plausible that Hughes's constitutional deprivation was caused by an express policy or a widespread practice that constituted a custom. *See Sims*, 506 F.3d at 515. In his Response brief, Hughes sets forth that Wardlow, Garcia, and Rejniak admittedly "followed protocol and appropriately refrained from intervening while relying on the medical professionals." (Dkt. 49 at 11 (referring to arguments set forth in Defendants' motion to dismiss)). Hughes maintains that "[i]f Defendants correctly followed protocol, it is the protocol itself that constitutes the several violations that make up Hughes' deliberate indifference claim." (*Id.*). Fatal to this argument is the fact that Hughes failed to plead relevant facts to support it in his Third Amended Complaint. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) (noting "the axiomatic rule that a plaintiff may not amend his complaint in his response brief"); *see also, e.g.*, *Oh v. Ocwen Loan Servicing, LLC*, No. 18-cv-7214, 2021 WL 131432, at *4 (N.D. Ill. Jan. 14, 2021) ("It is well established that a plaintiff cannot amend the complaint in a response brief to a motion to dismiss.").

In addition, Hughes's argument on this point is somewhat misled. Defendants do not admit to following protocols related to "refrain[ing] from intervening" in crisis situations, as Hughes suggests. (Dkt. 49 at 11). Rather, Defendants merely provided citations to *case law* – not established Jail policy – holding that non-medical law enforcement officials "are not expected to second-guess the expertise of medical personnel" and that officers need not intervene in circumstances that would put them in "significant jeopardy." (Dkt. 47 at 5–6). Indeed,

11

Defendants' only reference to Jail protocols related to Wordlaw's delay in "invok[ing] emergency protocols by reporting Plaintiff's threats of self-harm, which Rejniak responded to." (Dkt. 47 at 5).

The Court therefore grants Dart's motion to dismiss Count III against him in his official capacity with prejudice. (Dkt. 47).

## II. ADA and Rehabilitation Act Claims (Counts IV and V)

The Third Amended Complaint alleges claims for violations of Title II of the ADA and § 504 of the Rehabilitation Act by Sheriff Dart and Cook County related to their failure to reasonably accommodate Hughes's mental health illnesses. (*See, e.g.*, Dkt. 46 ¶¶ 74, 77, 84). Section 504 of the Rehabilitation Act prohibits a "qualified individual with a disability" from being "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," as a result of his disability. 29 U.S.C. § 794(a). Similarly, Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Given that the analysis under each statute is the same (with the exception that the Rehabilitation Act requires receipt of federal funding) and that Hughes can recover under only one statute, the court will analyze the two as one, referring predominantly to the ADA. *See Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 671–72 (7th Cir. 2012).

To plead a Title II claim, a plaintiff must show: (1) that he is a "qualified individual with a disability;" (2) that he was denied "the benefits of the services, programs, or activities of a public entity" or otherwise subjected to discrimination by such an entity; and (3) that the denial or discrimination was "by reason of his disability." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 853 (7th

Cir. 2018) (quoting *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996); 42 U.S.C. § 12132); *see also CTL* ex rel. *Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528–29 (7th Cir. 2014) (to prove disability discrimination, a plaintiff must show that (1) defendant intentionally acted on the basis of disability, (2) defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people). "State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.' " *Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131(1)(B)); *see Crawford v. Ind. Dept. of Corrs.*, 115 F.3d 481, 487 (7th Cir. 1997) (holding "that a state prisoner can make out a prima facie case of violation of the Americans with Disabilities Act"); *see also, e.g.*, *Thomas v. Dart*, No. 17-cv-4233, 2018 WL 4016315, at *3 (N.D. Ill. Aug. 22, 2018) ("Title II of the ADA protects detainees with qualified disabilities against discrimination by a public entity[ ] and requires jails to reasonably accommodate their disabilities.") (quoting *Boston v. Dart*, No. 14-cv-8680, 2015 WL 4638044, at *2 (N.D. Ill. Aug. 4, 2015)).

The parties do not appear to dispute that Hughes is a "qualified individual" under the statutes due to his "severe mental illness," (Dkt. 46 ¶¶ 73, 81), nor that the Jail is a "public entity" under the same, (*id.* ¶¶ 72, 82–83). Therefore, the Court's analysis turns on whether Hughes was denied the benefits of the any "services, programs, or activities" at the Jail by reason of his disability. Hughes maintains that he was "denied immediate medical care" following his self-harm, and that he was "denied this service because of his disability—his severe mental health illnesses that render him incapable of caring for himself and manifest themselves in potentially distasteful ways." (Dkt. 49 at 12). Importantly, however, Hughes does not allege that the Defendants refused to provide him with *any* medical care or failed to make any reasonable

13

accommodations for his disability. Rather, he challenges the adequacy of the medical treatment provided to him at the Jail, to the extent that Defendants delayed his access to health care. The Seventh Circuit has explained, however, that "[t]he ADA does not create a remedy for medical malpractice" or "incompetent treatment" of an individual's needs. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (finding that no discrimination was alleged where paraplegic plaintiff failed to show that he was treated any worse because he was disabled and the subject of his complaint amounted to "incompetent treatment of his paraplegia"). *See also Est. of Morris v. Jeffreys*, No. 3:20-cv-50320, 2021 WL 3187699, at *7 (N.D. Ill. July 28, 2021) ("[A] complaint about the adequacy of [plaintiff's] healthcare is not properly within Title II of the ADA."); *Hirsch v. Will Cnty., Ill.*, No. 19-cv-7398, 2021 WL 1531602, at *3 (N.D. Ill. Apr. 19, 2021) (citing *Bryant*, 84 F.3d at 249) (same); *Johnson v. Redmond*, No. 17-cv-50210, 2017 WL 6813706, at *2 (N.D. Ill. Oct. 30, 2017) (same); *Gaston v. Dart*, No. 15-cv-828, 2015 WL 5093797, at *3 (N.D. Ill. Aug. 25, 2015) (same).

Ultimately, Hughes fails to state a viable claim under the ADA or Rehabilitation Act since he did not allege that he was denied access to any services or activities because of his disability. *Bryant*, 84 F.3d at 249. The Court does not discount the seriousness of the events recounted in Plaintiff's Third Amended Complaint – but ADA and Rehabilitation Act claims are not the proper vehicle for relief under these circumstances. Therefore, Defendants' motion to dismiss the ADA and Rehabilitation Act claims is granted. (Dkt. 47).

### III. Indemnification Claim (Count VI)

Illinois law requires a local public entity to pay any tort judgment or settlement for compensatory damages for which it or an employee while acting within the scope of his employment is liable. *See* 745 ILCS 10 § 9-102. Based on the Court's decision, Recruit Wordlaw

is still a named individual defendant in Hughes's underlying cause of actions. Because Wordlaw qualifies as an "employee" of Cook County, (Dkt. 46 ¶¶ 8, 10), and because he is still party to the § 1983 action that may still result in liability, the indemnification claim survives as currently pled as to Defendant Wordlaw. *See, e.g.*, *Thurman v. Unknown Cook Cnty. Sheriff Emps.*, No. 18-cv-2720, 2018 WL 5315208, at *11 (N.D. Ill. Oct. 26, 2018); *Mohammed v. WestCare Found., Inc.*, No. 17-cv-7492, 2018 WL 2388407, at *5 (N.D. Ill. May 25, 2018).

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motion to Dismiss [47]. The Court denies the motion to dismiss Defendant Wordlaw from Count I and III. Defendants' motion is granted in all other respects.

Date: December 7, 2021

_____
Virginia M. Kendall
United States District Judge